**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**August 3, 2009**

**Elisabeth A. Shumaker**
**Clerk of Court**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

IN RE: JOHN WESLEY FORD, SR.,
CYNTHIA DAWN FORD,

      Debtors.

_____

JOHN WESLEY FORD, SR., CYNTHIA
DAWN FORD,

      Appellants,

    v.

FORD MOTOR CREDIT CORPORATION,

      Appellee,

_____

AMERICAN FINANCIAL SERVICES
ASSOCIATION, THE KANSAS
BANKERS ASSOCIATION,

      Amicus Curiae.

No. 08-3192

**APPEAL FROM THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF KANSAS**
**(B.C. NO. KS-08-049)**

Michael J. Studtmann, Law Office of Michael J. Studtmann, P.A., Wichita,
Kansas, for Appellant.

Thomas D. Lasater, Fleeson, Gooing, Coulson & Kitch, L.L.C., Wichita, Kansas (William M. Burke, Costa Mesa, California, and Lyndon W. Vix, Fleeson, Gooing, Coulson & Kitch, L.L.C., Wichita, Kansas, with him on the brief), for Appellee.

Charles R. Hay, Foulston Siefkin LLP, Topeka, Kansas, filed an Amici Curiae brief on behalf of American Financial Services in support of Appellee.

Patricia E. Hamilton, Henson, Hutton, Mudrick & Gragson, LLP, Topeka, Kansas, filed an Amici Curiae brief on behalf of The Kansas Bankers Association, in support of Appellee.

---

Before **MURPHY**, **SEYMOUR**, and **TYMKOVICH**, Circuit Judges.

---

**MURPHY**, Circuit Judge.

---

## I. Introduction

Appellants John Wesley Ford, Sr. and Cynthia Ford appeal an order of the Bankruptcy Court for the District of Kansas rejecting their proposed Chapter 13 bankruptcy plan. The Fords have an outstanding debt to Appellee Ford Motor Credit Company ("Ford Motor Credit") secured by their automobile. The debt includes the amount paid to discharge the "negative equity" on their trade-in vehicle. Negative equity is the amount owed on a loan in excess of the collateral's value. In their proposed bankruptcy plan, the Fords sought to bifurcate their automobile debt to Ford Motor Credit under 11 U.S.C. § 506(a) into secured and unsecured claims. The unsecured claim would be the portion of the debt used to discharge the negative equity in the trade-in. Ford Motor Credit

-2-

objected to the proposed plan, claiming the debt bifurcation was impermissible under the "hanging paragraph" of 11 U.S.C. § 1325(a). The bankruptcy court sustained the objection, and the Fords sought an immediate appeal to this court. We conclude we have jurisdiction to hear this appeal under 28 U.S.C. § 158(d)(2) and **AFFIRM** the ruling of the bankruptcy court.

## II. Background

The underlying facts of this case are not in dispute. The Fords purchased a 2007 Ford F-150 truck from Rusty Eck Ford on February 24, 2007. The Fords made a down payment of $1500 and received $40,168.30 in financing secured by the truck. At the same time, the Fords traded in their 2006 Ford truck. The 2006 truck was valued at $16,300, but the Fords owed $23,500 on it. $11,693.30 in financing covered "[a]mounts paid on [the Fords'] behalf." This included taxes, fees, a service contract, gap insurance, and $7200 to pay off the creditor on the 2006 truck for the amount owed on the vehicle in excess of its present value.

The Fords filed for Chapter 13 bankruptcy fewer than four months later. Under their proposed plan, they sought to reduce the secured debt on the 2007 truck by $7200, the amount of negative equity on their trade-in. That amount would be treated as an unsecured claim under the plan. Ford Motor Credit objected to the proposed treatment of its security interest.

Exercising jurisdiction pursuant to 28 U.S.C. § 157(b)(2)(K), (L), the bankruptcy court concluded the negative equity financing was part of the

-3-

creditor's purchase money security interest under the "hanging paragraph" in 11 U.S.C. § 1325(a) and thus the debt could not be bifurcated and "crammed down" pursuant to 11 U.S.C. § 506(a).  The bankruptcy court sustained Ford Motor Credit's objection to the proposed plan and ordered the Fords to file an amended plan treating the entire Ford Motor Credit debt as secured debt.

Both parties certified that an immediate appeal to this court was proper pursuant to 28 U.S.C. § 158(d)(2)(A) because the appeal presents a question of law as to which there is no controlling decision of this court or the Supreme Court and the question requires resolution of conflicting bankruptcy court decisions.  A panel of this court then authorized the appeal to proceed, which satisfied the jurisdictional requirements of 28 U.S.C. § 158(a)(3) and 28 U.S.C. § 158(d)(2)(A) for appeals to this court of interlocutory bankruptcy orders.  *See* Fed. R. Bankr. P. 8003(d).[1]

## III.  Discussion

The bankruptcy court's interpretation of the Bankruptcy Code is a question of law to be reviewed de novo.  *In re Lanning*, 545 F.3d 1269, 1274 (10th Cir. 2008).  When consumers enter Chapter 13 bankruptcy, they are normally permitted, if they wish, to bifurcate each secured debt into two claims: (1) an

---

[1]The Kansas Bankers Association and the American Financial Services Association have filed briefs as amici curiae along with motions to participate as amici.  The motions are hereby **GRANTED.**

amount equal to the present value of the collateral, and (2) any excess. 11 U.S.C. § 506(a)(1).  The excess portion is converted into unsecured debt.  *Id.*  The plan can then be "crammed down," or confirmed over the secured creditor's objection, so long as the creditor receives a lien securing the claim and the plan provides for payments to the creditor over the life of the plan equal to the present value of the collateral.  11 U.S.C. § 1325(a)(5)(B); *Assocs. Commercial Corp. v. Rash*, 520 U.S. 953, 957 (1997).  Whether debt is secured or unsecured is significant because secured creditors generally must be repaid in full before unsecured creditors receive anything.  11 U.S.C. § 1325(a)(5), (b)(1).

In 2005, Congress enacted the Bankruptcy Abuse Prevention and Consumer Protection Act ("BAPCPA").  One provision of BAPCPA amended the Bankruptcy Code to remove certain secured consumer debts from bifurcation and cramdown.  Pub. L. No. 109-8, § 306(b), 119 Stat. 23, 80 (2005).  At the end of 11 U.S.C. § 1325(a), Congress added an unnumbered paragraph, now commonly known as the "hanging paragraph," which reads, in relevant part, as follows:

> For purposes of paragraph (5), section 506 shall not apply to a claim described in that paragraph if the creditor has a purchase money security interest securing the debt that is the subject of the claim, the debt was incurred within the 910-day [sic] preceding the date of the filing of the petition, and the collateral for that debt consists of a motor vehicle (as defined in section 30102 of title 49) acquired for the personal use of the debtor . . . .

11 U.S.C. § 1325(a).

The hanging paragraph protects creditors possessing a "purchase money security interest securing the debt that is the subject of the claim" from § 506(a) bifurcation and cramdown. 11 U.S.C. § 1325(a). The parties agree the collateral in this case is a motor vehicle acquired for the personal use of the debtors and the motor vehicle was acquired within 910 days of the bankruptcy filing. The only issue in dispute is the extent to which Ford Motor Credit has a "purchase money security interest."

The issue of whether, under the hanging paragraph, a creditor has a purchase money security interest in the negative equity on a trade-in vehicle has been litigated extensively throughout the country, and the rulings have not been consistent.[2] *See In re Graupner*, 537 F.3d. 1295, 1300 (11th Cir. 2008) (collecting cases). The Tenth Circuit Bankruptcy Appellate Panel recently held creditors have a purchase money security interest in negative equity. *In re Padgett*, ___B.R.___, 2009 WL 2168824 at *5 (10th Cir. B.A.P., Jul. 20, 2009). District courts and bankruptcy courts within this circuit have reached varied results on the question. *Compare, e.g., Citifinancial Auto v. Hernandez-Simpson*, 369 B.R. 36, 48 (D. Kan. 2007) (holding bifurcation and cramdown are available

[2]Although many courts have concluded, as this court does, that the issue is resolved by interpreting state law, the American Financial Services Association notes in its amicus brief that Article 9 of the U.C.C. has been adopted, at least in part, in every state. Therefore, although courts have been interpreting the laws of different states, they have been interpreting mostly identical statutory provisions.

because purchase money security interest does not include negative equity), *In re McCauley*, 398 B.R. 41, 45-46 (Bankr. D. Colo. 2008) (same), *and In re Padgett*, 389 B.R. 203, 211-12 (Bankr. D. Kan. 2008) (same), *rev'd*, 2009 WL 2168824 at *5, *with In re Ford*, 387 B.R. 827, 833 (Bankr. D. Kan. 2008) (holding bifurcation and cramdown are unavailable because negative equity is part of purchase money security interest), *and In re Austin*, 381 B.R. 892, 897 (Bankr. D. Utah 2008) (same). Two circuit courts to date have ruled on the question, both holding the purchase money security interest held by a creditor includes the negative equity on the trade-in vehicle. *In re Price*, 562 F.3d 618, 628 (4th Cir. 2009); *In re Graupner*, 537 F.3d at 1301. The Second Circuit declined to rule on the issue, instead certifying the question to the New York Court of Appeals. *In re Peaslee*, 547 F.3d 177, 186 (2d Cir. 2008). After certification the New York Court of Appeals concluded purchase money security interests include the negative equity. *In re Peaslee*, ___N.E.2d___, 2009 WL 1766000 (N.Y. 2009). The issue previously came before this court, but the case was rendered moot before the court ruled on the merits. *In re Hunt*, 550 F.3d 1002, 1004 (10th Cir. 2008).

The Bankruptcy Code does not define the term purchase money security interest. Property interests referred to in the Bankruptcy Code are generally defined by state law. *Butner v. United States*, 440 U.S. 48, 54 (1979). This court, therefore, has looked to state law for a definition of the term as it is used

-7-

elsewhere in the Bankruptcy Code. *In re Billings*, 838 F.2d 405, 406 (10th Cir. 1988) ("[T]he courts have uniformly looked to the law of the state in which the security interest is created."). When Congress enacts a statute using a phrase that has a settled judicial interpretation, it is presumed to be aware of the prior interpretation. *Comm'r v. Keystone Consol. Indus., Inc.*, 508 U.S. 152, 159 (1993). When Congress drafted BAPCPA in 2005, it chose to use the term "purchase money security interest" without defining it. Under settled case law, that term, when used in the Bankruptcy Code, is interpreted with reference to state law. As a consequence, we presume Congress intended that term as used in BAPCPA to be interpreted according to state law.

Kansas has adopted the relevant portion of Revised Article 9 of the Uniform Commercial Code ("U.C.C."), and it also lists the Official U.C.C. Comment in its statutory compilation. Kan. Stat. Ann. § 84-9-103. Under Kansas law, "A security interest in goods is a purchase-money security interest: (1) To the extent that the goods are purchase-money collateral with respect to that security interest . . . ." *Id.* § 84-9-103(b). Purchase-money collateral is defined as "goods or software that secures a purchase-money obligation incurred with respect to that collateral." *Id.* § 84-9-103(a)(1). A purchase-money obligation is "an obligation of an obligor incurred as all or part of the price of the collateral or for value given to enable the debtor to acquire rights in or the use of the collateral if the value is in fact so used." *Id.* § 84-9-103(a)(2). Whether something is a

purchase-money security interest thus depends upon whether the underlying obligation was incurred to pay "all or part of the price of the collateral" or covers "value given to enable the debtor to acquire rights in or the use of the collateral." *Id.* § 84-9-103(a).

The Official Comment to Kan. Stat. Ann. § 84-9-103 provides additional guidance on what constitutes a purchase-money security interest. It states:

> [T]he "price" of collateral or the "value given to enable" includes obligations for expenses incurred in connection with acquiring rights in the collateral, sales taxes, duties, finance charges, interest, freight charges, costs of storage in transit, demurrage, administrative charges, expenses of collection and enforcement, attorney's fees, and other similar obligations.
>
> The concept of "purchase-money security interest" requires a close nexus between the acquisition of collateral and the secured obligation.

*Id.* § 84-9-103 cmt. 3.

The issue is whether paying off negative equity in a trade-in car is part of the "price" of the new car or part of the "value given to enable" acquisition of the new car.[3] The Fords point out that it is possible to acquire rights in a new car

_____

[3]The Official Comment does not differentiate between "price" and "value given to enable" in explaining what constitutes a purchase-money obligation. *See* Kan. Stat. Ann. § 84-9-103 cmt. 3. In the U.C.C.'s pre-revision Article 9, the "price" prong explicitly referred to security interests held by the seller of the item, while the "value" prong referred to security interests held by any "person" who incurred an obligation enabling a buyer to acquire collateral. U.C.C. app. O § 9-107. Thus, the "value" prong allowed third parties to acquire purchase money security interests if they advanced money to enable the acquisition of consumer

(continued...)

without paying off the negative equity in the old one. The debtor's rights in the two vehicles are distinct. The Fords further argue the trade-in encompasses two separate transactions: the transfer of rights in the trade-in vehicle and the transfer of rights in the new vehicle. They claim negative equity is different than the expenses listed in the Official Comment. In opposition to this position, Ford Motor Credit emphasizes that vehicle trade-ins are commonplace. It further argues that many vehicle trade-ins involve negative equity on the old vehicle and cites a study by J.D. Power and Associates estimating that approximately thirty-eight percent of new car buyers have negative equity at trade-in. It argues the trade-in of the old vehicle is directly related to the purchase of the new vehicle, and the former would not have occurred absent the latter. The Kansas Bankers Association, as amicus curiae, argues the Fords' position artificially breaks a single, package transaction into two parts.

The Fords' position has some logic, and it is not surprising that a number of courts have adopted it. On balance, however, it is not as persuasive as the

---

[3](...continued)
goods. *Id.* cmt. 2. Revised Article 9 has retained the "price" and "value" prongs in its definition of a purchase-money obligation, although neither the text nor the Official Comment mention the distinction between credit granted by sellers or third parties. *See* Kan. Stat. Ann. § 84-9-103(a)(2), cmt. 3. Because the Official Comment gives no indication that "price" and "value given to enable" have distinct meanings, *see id.* cmt. 3, this court interprets the statute such that, as in the pre-revision Article 9, the two terms are equivalent and refer respectively to obligations incurred by sellers and third parties.

position advanced by Ford Motor Credit. It may be theoretically possible to split the exchange of vehicles into two separate transactions, but that is not how the parties treated the deal. They signed a single agreement encompassing the trade-in of the old vehicle and the sale of the new vehicle. This type of transaction, moreover, is very common in the automobile industry. The very name "trade-in" implies the two vehicle exchanges are linked. The entire exchange would undoubtedly be a single transaction if the Fords did not have negative equity on the trade-in vehicle and the two parties were simply swapping items of value. As indicated by the data cited by Ford Motor Credit, the existence of negative equity on the trade-in vehicle has not prevented consumers from continuing to trade-in old vehicles for new ones, and it should not turn the swap into two separate transactions. As the Bankruptcy Court recognized, discharging negative equity is necessary to complete the trade-in because otherwise the dealer would take the old vehicle subject to a lien exceeding the vehicle's value. *In re Ford*, 387 B.R. at 831.

We conclude the trade-in exchange is essentially a single transaction. The expense incurred in retiring the lien on the trade-in vehicle, therefore, is an "expense[] incurred in connection with acquiring rights" in the new car. Kan. Stat. Ann. § 84-9-103 cmt. 3. There is also the requisite "close nexus" between the acquisition of the new vehicle and the secured obligation. *Id.* The entire debt incurred by the debtors is therefore a "purchase-money obligation," the new

-11-

vehicle is "purchase-money collateral" for the entire obligation, and the security interest in the entire debt is a purchase-money security interest under Kansas law. *Id.* § 84-9-103(a)-(b). Because Ford Motor Credit has a purchase-money security interest in the full amount of the debt, it is entitled to the protection of the hanging paragraph. 11 U.S.C. § 1325(a). The Bankruptcy Court was correct, therefore, in sustaining Ford Motor Credit's objection to the proposed plan.

The Fords contend, as does the dissent, that the phrase "expenses incurred in connection with acquiring rights" must be interpreted in light of its proximity to the other examples listed in the Official Comment. This is undoubtedly true, but we discern no significant difference between the expense of discharging negative equity on a trade-in and some of the other examples listed in the Official Comment. The Official Comment lists "sales taxes, duties, finance charges, interest, freight charges, costs of storage in transit, demurrage, administrative charges, *expenses of collection and enforcement, attorney's fees*, and other similar obligations" as expenses that can be part of a purchase-money security interest. Kan. Stat. Ann. § 84-9-103 cmt. 3 (emphasis added). Collection and enforcement expenses and attorney's fees are costs incurred so that the creditor may realize the value of the security interest. The discharge of negative equity clears the title of the trade-in vehicle, permitting the creditor to realize the value of the vehicle it receives as part of the trade. Both categories of expenses allow the creditor to realize its benefit of the bargain. The dissent argues collection and enforcement

-12-

expenses are distinguishable from negative equity because such expenses are transaction costs. Dissenting Op. at 7-8. The term "transaction costs," however, is entirely absent from the statute and the Official Comment. Had the drafters of the U.C.C. intended to limit a purchase-money security interest to cash price plus transaction costs, they could easily have done so. Instead, we are left with the language the drafters actually used, which we conclude is broad enough to encompass negative equity on trade-in vehicles.

The Fords also argue this result will enable predatory lending on the part of automobile dealers by encouraging them to refinance antecedent debt secured by a new vehicle. For reasons well articulated by the Fourth Circuit, this concern is overstated. *See In re Price*, 562 F.3d at 627. The reasons for treating the trade of an old vehicle for a newer one as a single transaction include the similarity in function between the new and old vehicles. The vehicle trade-in is a common, established transaction in the automobile industry, and it makes sense for many consumers to discard their old vehicles when they acquire new ones. The discharge of unrelated antecedent debt, however, may not bear the required "close nexus" to the acquisition of a new vehicle. *Id.*; Kan. Stat. Ann. § 84-9-103 cmt. 3. An automobile dealer who attempted to refinance unrelated antecedent debt and secure the new debt with the new car would present a question wholly different from the question presented here. *See In re Vega*, 344 B.R. 616, 617-18, 622 (Bankr. D. Kan. 2006) (refusing to apply hanging paragraph to portion of car

-13-

dealer's loan used to extinguish debt on previous car loan when consumer did not trade in the old vehicle).

**IV. Conclusion**

Under Kansas law, Ford Motor Credit holds a purchase-money security interest in the entire amount owed to it by the Fords. The debt therefore falls within the ambit of the hanging paragraph of 11 U.S.C. § 1325, and the Fords may not bifurcate the debt for the purpose of a cramdown under 11 U.S.C. § 506(a). The interlocutory order of the Bankruptcy Court is therefore **AFFIRMED** and the case is remanded to the Bankruptcy Court for further proceedings consistent with this opinion.

*Ford v. Ford Motor Credit Co.* (*In re Ford*), No. 08-3192

**TYMKOVICH**, Circuit Judge, dissenting.

I respectfully dissent because I read the Kansas Uniform Commercial Code, which controls the resolution of this case, as providing a narrower definition of "purchase money security interest" (PMSI) than the majority adopts.

In my view, Kansas law prohibits lenders from using a PMSI to secure a loan for negative equity, even if the loan is bundled with a standard car loan that is itself secured with a PMSI. Therefore, Ford Motor Credit Company does not have a PMSI covering the portion of the Fords' loan attributable to the $7,200 of negative equity in their truck. And because the hanging paragraph, 11 U.S.C. § 1325(a)(*), applies only to PMSIs, the $7,200 is not protected from cram down. Even so, Kansas's dual-status rule preserves PMSI status for the remaining portion of the Fords' loan and that portion is therefore immune from cram down.

### I. PMSIs Under Kansas Law

As the majority recognizes, a basic tenet of bankruptcy—and the starting point of this case—is the *Butner* principle: "Property interests are created and defined by state law." *Butner v. United States*, 440 U.S. 48, 55 (1979); *see also Raleigh v. Ill. Dep't of Revenue*, 530 U.S. 15, 20 (2000). The principle arises because generally, bankruptcy law is not designed to fundamentally alter property rights. Instead, "a bankruptcy proceeding is principally a forum in which all of a debtor's creditors can gather, assemble the debtor's assets, and divide them among themselves, according to the rights that state law gives them." Douglas G.

Baird, *Bankruptcy Procedure and State-Created Rights: The Lessons of Gibbons and Marathon*, 1982 Sup. Ct. Rev. 25, 35.

The validity of the *Butner* principle is undisputed here, but it is worth emphasizing because the hanging paragraph employs a state law term of art, PMSI, to define its scope. *See* 11 U.S.C. § 1325(a)(*). Though "Congress of course may do what it likes with entitlements in bankruptcy," *Raleigh*, 530 U.S. at 21, it chose not to alter the state law definition of PMSI as it relates to the hanging paragraph. Therefore, the resolution of this case turns on whether Kansas law allows a creditor to secure a loan for negative equity with a PMSI. *See Billings v. AVCO Colo. Indus. Bank* (*In re Billings*), 838 F.2d 405, 406 (10th Cir. 1988) ("For [the definition of PMSI], the courts have uniformly looked to the law of the state in which the security interest is created."); *see also In re Price*, 562 F.3d 618, 624 (4th Cir. 2009); *Graupner v. Nubell Credit Corp.* (*In re Graupner*), 537 F.3d 1295, 1298 (11th Cir. 2008).[1]

---

[1] While I recognize Kansas's U.C.C. provisions are similar to those in most states, that does not change the fundamental tenet that we interpret Kansas law consistent with the holdings of Kansas courts. As one judge put it, interpreting the U.C.C. to advance bankruptcy policy (assuming we can identify the correct policy at play here), "will becloud the clarity and predictability that the authors of Article 9 were seeking in enacting the statutes governing PMSIs." *In re Peaslee*, – N.E.2d –, 2009 WL 1766000, 2009 N.Y. Slip Op. 05197, at *9 (N.Y. June 24, 2009) (Smith, J., dissenting). Congress, of course, remains free to establish a uniform definition of PMSI applicable to cases governed by the hanging paragraph.

### A.      PMSIs Generally

A PMSI is a "special type of security interest" that is created when a secured party (here, Ford Credit) "provides the credit that enables the debtor [the Fords] to obtain the collateral [the Fords' new truck]."  Keith G. Meyer, *A Primer on Purchase Money Security Interests Under Revised Article 9 of the Uniform Commercial Code*, 50 Kan. L. Rev. 143, 152 (2001).  In the consumer goods context, a common example of a transaction that creates a PMSI is a purchase using a store-issued credit card:

> Typical credit sales should be relatively familiar to all of us, though we may not always recognize them.  Each time we use our Sears Card to buy a drill, a stereo, furniture, etc., we participate in a credit sale.  Sears is granting us credit to purchase those items from the store, and we are granting the store a PMSI in that item until it is paid off.

Christopher Harry, Comment, *To Be (Transformed) or Not To Be: The Transformation Versus Dual-Status Rules for Purchase-Money Security Interests Under Kansas' Former and Revised Article 9*, 50 U. Kan. L. Rev. 1095, 1097 (2002).  In this example, the consumer is the debtor, and Sears is the purchase-money lender.

Aside from the benefit conferred by the hanging paragraph (i.e., protection from cram down for some car loans), purchase-money lenders receive additional advantages under the U.C.C. and other law.  Most importantly, a purchase-money lender has "super-priority"—the lender's claim to the purchase-money collateral

trumps the claims of other secured creditors. *See Matthews v. Transamerica Fin. Servs.* (*In re Matthews*), 724 F.2d 798, 801 (9th Cir. 1984) ("Purchase money security is an exceptional category in the statutory scheme that affords priority to its holder over other creditors . . . ."). Additionally, unlike other security interests, PMSIs in household goods cannot be "avoided" (i.e., extinguished) in bankruptcy. *See* 11 U.S.C. § 522(f)(1)(B); *see also In re Billings*, 838 F.2d at 406 ("[I]f the security interest . . . retains its status as a purchase money security interest . . . then debtors may not avoid the security interest under § 522(f)."). In the household goods context, PMSIs have yet another benefit: Federal Trade Commission regulations prohibit lenders from taking "a nonpossessory security interest in household goods *other than* a purchase money security interest." 16 C.F.R. § 444.2(a)(4) (emphasis added).

Because of the advantages of PMSIs, lenders sometimes attempt to use them to secure obligations unrelated to purchase-money collateral. Indeed, "overloaded" PMSIs are a recurring concern in the law of secured transactions, and jurisdictions have adopted various mechanisms to prevent them. *See* Ann E. Conaway Stilson, *The 'Overloaded' PMSI in Bankruptcy: A Problem in Search of a Resolution*, 60 Temp. L. Q. 1, 16 (1987).[2]

---

[2] Several federal circuit cases from the 1980s addressed the treatment of overloaded PMSIs in bankruptcy, with respect to the anti-avoidance provision in § 522(f). *See In re Billings*, 838 F.2d at 408 (suggesting that an obligation can "be considered only *partly* a purchase money debt," and therefore a security

(continued...)

Some jurisdictions eliminate PMSI status if a lender attempts to secure a loan that exceeds the amount required for the debtor to obtain the collateral. *See* Marion W. Benfield, Jr., *Consumer Provisions in Revised Article 9*, 74 Chi-Kent L. Rev. 1255, 1292 (1999). Under this so-called "transformation" rule, "a security interest that was originally a purchase money interest loses that status entirely if the debt is restructured and an additional nonpurchase money advance is made." *Id*.; *see also In re Matthews*, 724 F.2d at 801 (applying the transformation rule under California law).

Other jurisdictions, including Kansas, adopt the "dual-status" rule, which preserves an overloaded PMSI "to the extent that it secured the price of the original goods even though the security agreement also secured the price of other items." Meyer, 50 Kan. L. Rev. at 155–56 & n.64; Kan. Stat. Ann. § 84-9-103(f) (2007) ("[A] purchase-money security interest does not lose its status as such, even if: . . . the purchase-money collateral also secures an obligation that is not a purchase-money obligation."); *see also Snap-On Tools, Inc. v. Freeman* (*In re Freeman*), 956 F.2d 252, 254–55 (11th Cir. 1992) ("A security interest in collateral is 'purchase money' to the extent that the item secures a debt for the

---

[2](...continued)
interest can still be considered a PMSI with respect to the portion that is not overloaded (emphasis added)); *Pristas v. Landaus of Plymouth, Inc.* (*In re Pristas*), 742 F.2d 797, 801 (3d Cir. 1984) (adopting "pro tanto preservation of purchase-money security interests," but invalidating overloaded portions of PMSIs); *In re Matthews*, 724 F.2d at 801 (holding that when a creditor refinances a purchase money obligation, the PMSI is extinguished).

money required to make the purchase. If an item of collateral secures some other type of debt, e.g., antecedent debt, it is not purchase money.").

These principles underscore that the benefits of PMSIs come with certain limitations. When Congress chose to use the state law term PMSI to confine the scope of the hanging paragraph, it adopted these state law limitations as well and made them applicable in bankruptcy.

### B. The Kansas Definition of PMSI

The majority identifies the key Kansas statutory language governing whether negative equity may be secured with a PMSI. As the majority states, "[t]he issue is whether paying off negative equity in a trade-in car is part of the 'price' of the new car or part of the 'value given to enable' acquisition of the new car." Maj. Op. at 9. I agree with the majority that under the Kansas U.C.C., these terms include more than just the vehicle's sticker price. But I disagree with the majority's broad interpretation of these terms. In my view, Comment 3 to U.C.C. § 9-103 provides the limiting framework.

Notably absent from the items contained in Comment 3 is a description of negative equity. Instead, the comment lists items which are part of the "price" of a new car or the "value given to enable" the purchase of a new car. Granted, the list is nonexclusive and includes "other similar obligations." But Comment 3 tells us that a PMSI "requires a close nexus between the acquisition of collateral and the secured obligation." Under familiar principles of statutory interpretation, the

other items on Comment 3's list shed light on whether negative equity bears the requisite "close nexus" to the acquisition of a new car. *See Jarecki v. G.D. Searle & Co.*, 367 U.S. 303, 307 (1961) ("The maxim noscitur a sociis, that a word is known by the company it keeps, while not an inescapable rule, is often wisely applied where a word is capable of many meanings in order to avoid the giving of unintended breadth to the Acts of Congress."); *State v. Urban*, 193 P.3d 515, 518 (Kan. Ct. App. 2008) (employing the maxim to interpret a Kansas statute).

The items on Comment 3's list—such as sales tax, finance charges, freight charges, costs of storage in transit, attorney's fees, and collection costs—are all expenses that will be charged uniformly to any potential purchaser of a vehicle who chooses to finance the purchase. Each item is akin to a transaction cost, a cost that adds no particular value for either the buyer or the seller but is instead simply "the cost of using the price mechanism." R.H. Coase, *The Nature of the Firm*, 4 Economica 386, 390 (1937); *see also Black's Law Dictionary* 372 (8th ed. 2004) (defining "transaction cost" as "[a] cost connected with a process transaction, such as a broker's commission, the time and effort expended to arrange a deal, or the cost involved in litigating a dispute"); Harold Demsetz, *The Cost of Transacting*, 82 Q.J. Econ. 33, 35 (1968) ("Transaction cost may be defined as the cost of exchanging ownership titles.").

Negative equity is different.  It is not a transaction cost, but a transfer of money for value.[3]  Much like a home equity loan used to pay a preexisting credit card debt, the portion of the auto loan attributed to negative equity is not used for the purchase of some new piece of collateral or the costs inherent in the purchase. It is used for another purpose altogether.  *See AmeriCredit Fin. Servs., Inc. v. Penrod* (*In re Penrod*), 392 B.R. 835, 852 (9th Cir. B.A.P. 2008) ("[N]egative equity is nothing more than a refinancing of the preexisting debt owed on the trade-in.  There is no necessary connection between this refinancing and the car's acquisition.").  Unlike the other expenses listed in Comment 3, the amount (and even the existence) of negative equity depends upon circumstances completely unrelated to the price of the new vehicle and its financing or the costs associated with transfer of title.  Indeed, negative equity differs vastly for each purchaser, depending in large part on the purchaser's past choices.

Thus, although the Fords and their dealer were free to use the new pickup as security for a loan to pay an antecedent debt, that does not mean paying the old debt was part of the "price" of the pickup.  Nor does it mean the portion of a loan

---

[3]  The Fourth Circuit has suggested that negative equity is, indeed, a transaction cost because it is an expense incurred during the purchase of a new car.  *See In re Price*, 562 F.3d at 627.  I respectfully disagree.  The Fourth Circuit's approach equates any secured refinancing with a transaction cost.  The term cannot bear such a broad definition.  *See* Demsetz, 82 Q.J. Econ. at 35 (noting the problems inherent in a broad definition of "transaction cost").  That a loan for negative equity usually occurs in connection with the purchase of a new vehicle does not render it a transaction cost.

used to pay off the old debt was a *purchase money* security interest.  As a Texas bankruptcy court stated:

> One may borrow money to buy something (*e.g.*, a new vehicle), and also borrow additional money for some other purpose (*e.g.*, to pay off the balance of a loan for the trade-in vehicle).  The part used to buy something is purchase money obligation.  The part used for some other purpose is not.

*In re Saunders*, 377 B.R. 836, 853 (Bankr. W.D. Tex. 2007), *rev'd*, 403 B.R. 435 (W.D. Tex. 2009).  In my view, this is a more consistent interpretation of the Kansas U.C.C. than the majority's.  By interpreting the term "price" in section 84-9-103(a)(2) to mean the actual price of the vehicle plus amounts akin to transaction costs, the limits of PMSIs are easily discernible.  In contrast, allowing a creditor to create a PMSI for any money advanced at the same time as a sale enables the creditor to overload the PMSI and defeats the limitations imposed by state law.

### C.    *The Dual-Status Rule*

Because I would hold that Ford Credit does not have a PMSI securing its loan for the Fords' negative equity, I must answer "the question of what to do with that portion of the debt not entitled to purchase-money status."  *See In re Penrod*, 392 B.R. at 838.

As mentioned above, Kansas has adopted the dual-status rule, which preserves a PMSI to the extent it secures a purchase-money obligation and

-9-

destroys it to the extent the PMSI is overloaded.  Kan. Stat. Ann. § 84-9-103(f) (2007); *see also* Harry, 50 U. Kan. L. Rev. at 1121–22 (noting that, unlike the standard version of Article 9, the Kansas version expressly adopted the dual-status rule for *all* transactions, including consumer transactions); *see also In re Gibson*, 16 B.R. 257, 268–69 (Bankr. D. Kan. 1981) (applying Kansas law and adopting the dual-status rule in the consumer context).[4]  Consistent with the *Butner* principle, I would hold that the Kansas dual-status rule applies: part of Ford Credit's claim is a PMSI protected from cram down, and part is merely a standard secured claim which may be subject to cram down.

This does not resolve the case, however.  Another question remains, namely how to adjust Ford Credit's claims to account for payments the Fords made on their car loan before entering bankruptcy.  Should the payments be applied first to the negative equity portion of the loan, or should they be applied first to the PMSI portion of the loan?  Kansas law states that payments must be applied "[i]n accordance with any reasonable method of application to which the parties agree." Kan. Stat. Ann. § 84-9-103(e)(1) (2007).  In the absence of such an agreement, Kansas law requires courts to consider "any intention of the obligor manifested at

---

[4]  Some courts have held that regardless of state law, federal policy requires the dual-status approach in the context of the hanging paragraph.  *See In re Penrod*, 392 B.R. at 859 ("[W]e are persuaded that the Dual Status Rule should be applied as the federal rule." (footnote omitted)); *see also In re Hargrove*, 400 B.R. 616, 620 (Bankr. M.D. Tenn. 2008) (noting that the dual-status rule is "consistent with the purpose of" the hanging paragraph).  But selectively applying the *Butner* principle, as these cases do, defeats its purpose.

or before the time of payment." *Id*. § 84-9-103(e)(2). Finally, if no such intent was manifested, payments go first to the PMSI, then to the non-PMSI. *See id*. § 84-9-103(e)(3); *In re Kellerman*, 377 B.R. 302, 304 (Bankr. D. Kan. 2007). I would remand this case, instructing the bankruptcy court to apply these rules to determine the amount of Ford Credit's claims.

## II. Other Approaches

I recognize my conclusion is at odds with the majority's reasoning, and with the reasoning of a number of other courts that have addressed the treatment of negative equity under the hanging paragraph. These courts have made numerous arguments, and several common themes have emerged.

Some courts—including the majority—conclude that the financing of negative equity is part of a "package deal" and as such should be protected by the same PMSI that covers the sale price of a new vehicle. *See, e.g.*, *In re Graupner*, 537 F.3d at 1302. Others utilize the in pari materia canon (i.e., the canon that encourages courts to construe statutes together), holding that the term "price" in the U.C.C. includes negative equity, because this is how other laws define the term "price." *See, e.g.*, *id*. at 1301. Finally, some courts rely on the legislative history of the hanging paragraph to conclude Congress intended negative equity to be protected from cram down. *See, e.g.*, *In re Price*, 562 F.3d at 628.

Though the majority does not make all of these arguments, I take this opportunity to explain why I find them unpersuasive.

-11-

### A.    The "Package Deal" Approach

One common line of reasoning holds that negative equity is part of a "package deal" and cannot be separated from the remainder of the PMSI.  The *In re Graupner* court, for example, viewed the financing of negative equity as "part of the same transaction" as the purchase of the new vehicle such that it was "properly regarded as a 'package deal.'"  537 F.3d at 1302.  To the Eleventh Circuit, negative equity was an "integral part" of the purchase and was "inextricably intertwined" with the transaction.  *Id.*; *see also In re Price*, 562 F.3d at 625 ("All of the Prices' debt . . . was incurred at the same time, in the same contract, and for the same purpose: acquiring the new car.").  The majority adopts this approach, concluding that "the trade-in exchange is essentially a single transaction."  Maj. Op. at 11.

The intuitive difficulty with this position is that vehicle purchasers—even those that buy on credit—are not *required* to purchase the new vehicle by trading in an old one.  Whether doing so is necessary or even desirable depends on their individual circumstances.  Perhaps in this case it is true that *the Fords* could not have purchased their new pickup without trading in their old one.  And perhaps financing the negative equity was "integral" to *the Fords* completing their purchase, because it was inconvenient or impossible for them to complete the purchase any other way.

-12-

The definition of PMSI, however, does not encompass any and every expense that might enable a particular purchaser to complete the purchase in the most convenient manner.  If the Fords were unable to drive themselves to the dealership, we would not consider the cost of a taxi as part of the price of the new truck, even if the dealer were willing to pay for it and fold it into the sales contract.  If the Fords did not qualify for a car loan because their resources were strained by too much credit card debt at high interest rates, they could not fold those debts into the PMSI for a new car even if the attendant lower interest rate solved their credit problem and enabled them to obtain the car loan.

Allowing a creditor to transform antecedent debt into a PMSI by refinancing the debt into a new contract amount that includes the purchase price of new collateral would convert the concept of "purchase money" from a defined term to one that can be expanded at the will of the parties.  *See In re Conyers*, 379 B.R. 576, 582 (Bankr. M.D.N.C. 2007) ("Allowing the Debtor to rollover negative equity into the new loan was simply an accommodation.  It was an arrangement made as a favor to another."); *In re Westfall*, 365 B.R. 755, 762 (Bankr. N.D. Ohio 2007) (providing the extreme example of a 'debtor [who] would not have made it to the dealer's lot were it not for the emergency appendectomy, [making] payment of the doctor's outstanding fee . . . an enabling expense"), *rev'd in part*, 376 B.R. 210.

Congress confined the hanging paragraph to PMSIs, and I cannot conclude the hanging paragraph protects any and every loan secured by an automobile.

### B.    The In Pari Materia Argument

Another approach is to apply the in pari materia doctrine. Courts employing this argument look to other statutes that use the term "price"—frequently, state motor vehicle financing statutes—and, when these other statutes explicitly include negative equity within the definition of price, interpret the U.C.C. in pari materia. *See, e.g. In re Graupner*, 537 F.3d at 1301 (finding support in the definition of "cash sale price" in Georgia's Motor Vehicle Sales Financing Act); *Gen. Motors Acceptance Corp. v. Peaslee*, 373 B.R. 252, 260 (W.D.N.Y. 2007) (analyzing the definition of "cash sale price" in New York's Motor Vehicle Retail Installment Sales Act).

But at least some other courts have considered this a dubious application of the in pari materia doctrine, as the vehicle financing statutes are concerned more with disclosure than regulation and therefore do not cover the same subject matter. For example, the Second Circuit disapproved of a bankruptcy court's reliance on the New York Motor Vehicle Retail Installment Sales Act in interpreting the U.C.C.'s definition of "price." *Peaslee v. GMAC, LLC* (*In re Peaslee*), 547 F.3d 177, 186 (2d Cir. 2008) ("But it is not manifest that 'price' in N.Y. U.C.C. § 9-103(a)(2), or 'expense' in Comment 3 to that provision, should be given the same meaning as 'cash sale price' in the MVRISA."). The Second

Circuit noted the New York motor vehicle statute was aimed primarily at disclosure and served different purposes from the U.C.C., making an in pari materia interpretation of the term "price" suspect. *Id.*

I agree with the Second Circuit insofar as it views the in pari materia doctrine as inapplicable. Indeed, here the use of the in pari materia doctrine is even less helpful because the parties have pointed to no other Kansas statute defining the term "price." Ford Credit points mainly to the *federal* Truth in Lending Act (TILA), 15 U.S.C. § 1601 *et seq.*—or, more specifically, to the Federal Reserve Board's interpretation of that Act in Regulation Z, which requires disclosure of negative equity as part of the total sale price of an automobile. *See* 12 C.F.R. § 226.18(b)(2) & (j). But the manner in which a federal agency has interpreted the term "price" in a federal statute sheds little light on what the Kansas legislature meant when it employed the term in its version of the U.C.C. *But see GMAC v. Horne*, 390 B.R. 191, 202–03 (E.D. Va. 2008) (adopting TILA's definition of "total sales price" as the meaning of "price" under the Virginia U.C.C.).

I acknowledge that in its Uniform Consumer Credit Code, the Kansas legislature referred to both TILA and Regulation Z when it empowered an administrator to "adopt rules and regulations necessary to carry out the provisions and terms of the uniform consumer credit code which are consistent with or no less restrictive than the truth-in-lending act . . . and regulation Z." Kan. Stat.

-15-

Ann. § 16a-6-117 (2007).  Even so, there is no reason to believe that in doing so,

the Kansas legislature meant to suggest the terms in its other statutes should now

be interpreted as identical to an agency interpretation of a federal disclosure law.

The Uniform Consumer Credit Code does not even use the word "price," and I

fail to see how the in pari materia canon can be helpful in determining what the

legislature meant by "price" in Kan. Stat. Ann. § 84-9-103 (2007).

Additionally, even if I were to apply the in pari materia doctrine, it does

not suggest negative equity is part of the "price" of a new vehicle.  Under Kansas

tax law, the term "sales or selling price" does *not* include "the amount equal to

the allowance given for the trade-in of property."  Kan. Stat. Ann. § 79-

3602(ll)(3)(D) (2007).  Here, the "allowance given for the trade-in of property"

was the $7,200 of negative equity in the Fords' old truck.  Kansas tax law

excludes this amount from the sale price of the Fords' new truck, and the in pari

materia doctrine would therefore suggest the negative equity was not part of the

sale price under the Kansas U.C.C.  I doubt Kansas tax law—like other states'

motor vehicle financing statutes—tells us anything about the Kansas U.C.C.  But

a comparison to Kansas tax law illustrates that the in pari materia doctrine, even

if applicable, does not offer much guidance in this case.

### C.    *Legislative History*

Finally, some courts examine the legislative history of the hanging paragraph and, despite its inconsistencies, find that it unambiguously supports the conclusion that negative equity is included in the state law definition of PMSI. *See, e.g.*, *In re Price*, 562 F.3d at 628; *In re Graupner*, 537 F.3d at 1303 & n.5. This is problematic for two reasons.

First, legislative history is "often murky, ambiguous, and contradictory," and we should resort to it only when a statute's plain language is unclear. *See United States v. Hinckley*, 550 F.3d 926, 947 (10th Cir. 2008) (Gorsuch, J., concurring) (quoting *Exxon Mobile Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546, 568 (2005)), *cert. denied*, 129 S. Ct. 2383 (2009). Indeed, the Supreme Court has "repeatedly held[ that] the authoritative statement is the statutory text, not the legislative history or any other extrinsic material." *Exxon Mobile Corp.*, 545 U.S. at 568. Here, the statutory language is far from ambiguous. It expressly states that only PMSIs are protected from cram down in bankruptcy. Whether this state law term of art is itself ambiguous is another story. Case law (including this very opinion) shows that courts can reasonably disagree on the meaning of the term under various *state* laws. But the plain language of the hanging paragraph is clear, making resort to its legislative history unnecessary and potentially misleading.

Second, the legislative history of the hanging paragraph provides no pat answer to whether negative equity is protected from cram down. As Ford Credit

explains in its brief, one legislative proposal predating the enactment of the hanging paragraph was narrow and protected from cram down only the "unpaid balance of the *purchase price* of the personal property." H.R. Rep. No. 105-794, at 25 (1998) (Conf. Rep.) (emphasis added). This language, if enacted, arguably would not have protected amounts such as title fees, taxes, or negative equity. But Ford Credit dismisses this language and emphasizes a competing version of the bill, which was broader and would have protected "an *allowed claim* that is secured under applicable non-bankruptcy law." S. Rep. No. 105-253, at 7 (1998) (emphasis added). This language seems to encompass negative equity, which is part of a lender's secured claim.

Congress ultimately settled on protecting *only* purchase money security interests from cram down. *See* 11 U.S.C. § 1325(a)(*). This might have reflected a Congressional compromise to protect certain fees that are properly considered part of a purchase-money loan—i.e., fees akin to transaction costs—and not to protect negative equity. But we are not privy to Congress's internal deliberations, and this is why we ordinarily must confine our inquiry to the language of statutes as enacted. *See Exxon Mobile Corp.*, 545 U.S. at 568.

Ford Credit argues that the legislative history supports their position and implies that Congress intended to broadly protect car lenders, regardless of how loan proceeds are used. Other courts agree with this reading, assuming that the "architects of the hanging paragraph intended only good things for car lenders and

-18-

other lienholders." *In re Graupner*, 537 F.3d at 1303 (internal alterations and quotation marks omitted) (quoting *AmeriCredit Fin. Servs. v. Long* (*In re Long*), 519 F.3d 288, 294 (6th Cir. 2008)). These courts fail to recognize, however, that Congress must reconcile many competing interests when drafting legislation. Presuming Congress resolved all policy questions in favor of one constituency is simplistic and likely inaccurate. *See Circuit City Stores, Inc. v. Adams*, 532 U.S. 105, 120 (2001) ("We ought not attribute to Congress an official purpose based on the motives of a particular group that lobbied for or against a certain proposal—even assuming the precise intent of the group can be determined, a point doubtful both as a general rule and in the instant case. It is for the Congress, not the courts, to consult political forces and then decide how best to resolve conflicts in the course of writing the objective embodiments of law we know as statutes.").

Congress specifically chose to use the term "purchase money security interest" instead of something broader. I believe the most prudent practice is to assume Congress meant what it said.

### *III. Conclusion*

I conclude that negative equity is neither "all or part of the price of" a new car, nor "value given to enable the debtor to acquire rights in or the use of" a new car. Thus, I would hold that the Fords' negative equity is not part of Ford Credit's PMSI under Kansas law, and it is therefore not protected from

bifurcation and cram down under the hanging paragraph.  Under the dual-status rule, only the purchase price of the Fords' new car and related fees that are akin to transaction costs are secured by a PMSI.  Though I recognize my view is at odds with the conclusions of several other courts, including the Fourth and Eleventh Circuits, I believe my interpretation comports more closely with the meaning of purchase money security interest under the Kansas U.C.C. than does the opposing view.